UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (GBD)(SN) |
|---|---|

This document relates to:
*Cheryl Rivelli, et al. v. Islamic Republic of Iran*, No. 1:18-cv-11878 (GBD)(SN)
*Matthew Rowenhorst, et al. v. Islamic Republic of Iran*, No. 1:18-cv-12387 (GBD)(SN)

## *RIVELLI* AND *ROWENHORST* PLAINTIFFS' RULE 72(b) OBJECTIONS TO THE MAGISTRATE JUDGE'S MAY 23, 2025 REPORT & RECOMMENDATION

ANDERSON KILL P.C.
Jerry S. Goldman, Esq.
Bruce E. Strong, Esq.
Alexander Greene, Esq.
7 Times Square, 15th Floor
New York, NY 10036
Tel:   (212) 278-1000
Fax:   (212) 278-1733
Email: jgoldman@andersonkill.com
         bstrong@andersonkill.com
         agreene@andersonkill.com

*Attorneys for Plaintiffs*

Dated:  New York, New York
        June 27, 2025

DOCS-100788689.6

The *Rivelli* and *Rowenhorst* plaintiffs, the 9/11 victim estates of Michael Theodoridis and Rahma Salie, by and through undersigned counsel, respectfully submit limited Fed. R. Civ. P. 72(b) objections, pursuant to 28 U.S.C. § 636(b)(1), to a portion of Magistrate Judge Netburn's May 23, 2025 Report and Recommendation, ECF No. 10965 ("Report").[1]

Plaintiffs largely agree with Magistrate Judge Netburn's reasoned analysis of a "novel issue," Report at 1, including her analysis that this Court has subject matter and personal jurisdiction over the Islamic Republic of Iran ("Iran") for its role in the September 11th attacks, that Iran defaulted, that New York state law applies to plaintiffs' claims against Iran, and that plaintiffs properly moved for a judgment against Iran for intentional infliction of emotional distress ("IIED"). Report at 5, 8. Plaintiffs' sole objection to the Report is that Plaintiffs believe they satisfy all four elements of an IIED claim under New York law whereas the Report found that Plaintiffs have only satisfied the first three elements— (1) extreme and outrageous conduct, (2) intent to cause, or disregard of a substantial probability of causing, severe emotional distress, and (3) a causal connection between the conduct and injury—but not (4) severe emotional distress. Report at 12 ("The Plaintiffs' uncontroverted submissions and this case's long record plainly establish the first three elements of an IIED claim under New York law.").

Oddly, the Report itself acknowledges "a self-evident truth": that "Ms. Salie and Mr. Theodoridis suffered severe emotional distress during the 9/11 Attacks." Report at 13. Plaintiffs agree. But rather than ending the inquiry there, the Report elaborates that because the severe emotional distress Plaintiffs suffered was not sufficiently analogous to *solatium* emotional distress damages that have been awarded in other terrorism cases, Plaintiffs' motion must be

---

[1] All ECF numbers refer to the MDL docket, 03-md-01570.

denied. That is wrong as a matter of law. Even if Plaintiffs' severe emotional distress is not analogous to solatium damages, that does not mean these 9/11 victims did not suffer compensable "severe emotional distress" under New York law. Plaintiffs recognize that the Report's focus on solatium emotional distress damages may have been prompted by Plaintiffs' own memorandum of law at ECF No. 10327. However, Plaintiffs focused on solatium damages as analogous to IIED severe emotional distress damages because the Court had previously done so in this case for purposes of determining the proper damages *amount* to award other non-U.S. national plaintiffs, *see* ECF No. 9931 at 5-6, not to limit what constitutes compensable severe emotional distress under New York law. Rather, settled New York law is clear about what constitutes compensable severe emotional distress in third-party IIED claims, which is readily applicable in this context.

Accordingly, upon a *de novo* review, the Estates of Michael Theodoridis and Rahma Salie should each be awarded $12,500,000 intentional infliction of emotional distress damages, in accordance with 28 U.S.C. § 1605B ("JASTA"), as the Court has done previously for other non-U.S. national 9/11 family members at ECF No. 9931.

I.  **BACKGROUND**

This case arises out of the tragic deaths of Michael Theodoridis and Rahma Salie, a married couple who were passengers on American Airlines Flight 11 on September 11, 2001, along with their unborn child. Michael Theodoridis grew up in Switzerland and moved to Massachusetts to study at Boston University. *See* ECF No. 10328 at 13. Rahma Salie grew up in Japan and similarly moved to Massachusetts to attend Wellesley College. *Id*. Michael and Rahma were married in 1998. *Id*. On September 11, 2001, Michael and Rahma boarded Flight 11 to attend a wedding in California. *Id*. Rahma was pregnant, and the couple was expecting their

first child in November 2001. *Id*. Michael and Rahma and their unborn child were killed when the plane was flown into the World Trade Center.

While Michael Theodoridis and Rahma Salie and their unborn child were killed simultaneously, both Michael and Rahma sustained extreme emotional distress from (1) witnessing the other's death, (2) witnessing the other's impending death (3) witnessing their unborn child's impending death, *and* (4) witnessing the other's severe emotional distress. The horror Michael Theodoridis and Rahma Salie experienced prior to their deaths is well supported by the expert report of Dr. Alberto Diaz, Jr., M.D., a retired Navy Rear Admiral, which has been submitted to, and accepted by, this Court. *See* ECF No. 2618 at 8 (Judge Maas' Report and Recommendation) ("Although the specifics of each decedent's demise remain largely unknown, the Plaintiffs have submitted the expert report of Dr. Alberto Diaz, Jr., M.D., a retired Navy Rear Admiral, which provides a chilling account of the horrific conditions that each of the Estate Plaintiffs' decedents likely encountered immediately before his or her death. (See Pls.' Mem. Exs. D, E); *see also* Report at 3 ("The Court credited the expert report of Dr. Alberto Diaz, Jr., M.D., to grant a uniform pain and suffering award to every estate—because Dr. Diaz's report 'provide[d] a chilling account of the horrific conditions that each of the Estate Plaintiffs' decedents likely encountered immediately before his or her death.'").

In opining on the extreme fear that 9/11 victims experienced, Dr. Diaz noted that 9/11 victims' "physiological response [could have] [ ] include[d] an increased heart rate (sometimes feeling as if your heart was going to "jump out of your chest"), elevated blood pressure, drying of the mouth, trembling, sweating, blanching, feelings of faintness, nausea and vomiting, and a general homeostatic dysregulation." ECF No. 2554-3 (Exhibit B) at 2.

3

In addition to physiological responses 9/11 victims may have experienced, Dr. Diaz gave chilling testimony on the psychological trauma endured by 9/11 victims:

> "The psychological effects of extreme fear and fright are equally dreadful. Overwhelming fear leads to overwhelming anxiety, which many have described as feeling 'near death.' Subjectively, overwhelming anxiety is the most intense and dreadful feeling a human being can experience. Unrelenting, extreme anxiety leads to a general cognitive 'meltdown,' Once 'flight or fight' becomes clearly impossible, the mind is, for all intents and purposes, immobilized. This 'quiescence' had evolutionary value in order to freeze the individual in an unexpected encounter with a dangerous predator, but in the modern world it compounds the dangers and threats surrounding the individual. Quiescence does not imply merciful 'numbness,' only a physical impossibility to react to the threat. Some authors often refer to the 'parallel mind of fear.' Another consequence of this type of overwhelming stress is 'tachypsia.' As if experiencing the aforegoing was not enough, nature compounds the pain by subjectively slowing time down. What may transpire over the course of a few seconds may be experienced as happening in very slow motion, thus prolonging the agony. Extreme fear and anxiety is an experience that very few of us can relate to, but, from the descriptions above, we can at least obtain a glimpse into the tortured and desperate minds of the victims."

ECF No. 2554-3 (Exhibit B) at 3.

And in specifically discussing the trauma experienced by the passengers on American Airlines Flight 11, , the very flight these plaintiffs were on, Dr. Diaz discussed how the hijackers stabbed two flight attendants and slashed the throat of a business class passenger, how they threatened passengers and crew with detonating a bomb, and also used Mace and/or pepper spray for emphasis. ECF No. 2554-3 (Exhibit B) at 3-4.

Dr. Diaz further discussed phone communications of two of the flight attendants:

> "Two flight attendants (Betty Ong and Madeline Sweeny) contacted the ground via cell phone and were able to describe the on-going situation. At 08:18 the plane entered a "rapid descent" and began to move erratically; at 08:19, Ms. Sweeny stated "we can't breathe" (apparently because of the Mace or pepper spray being used). Finally at 08:44 Ms Ong reported that "We are flying very, very low! We are flying way too low! *Oh my God, we are way too low!!*" A few seconds later she was consumed by the

4

exploding fireball resulting from the high speed impact with the North Tower of the World Trade Center." ECF No. 2554-3 (Exhibit B) at 4. Dr. Diaz opined with respect to the lead up to the crash into the World Trade Center: "[i]t is clear that both planes descended extremely rapidly, intentionally picking up speed to maximize destructive energy. They were flying very erratically, particularly AA 11 as it flew among the skyscrapers of New York City. Videos of AA 11 capture the sound of the engines as they roar to full throttle just before impact. [ ] It is difficult to estimate the induced "G" forces, but they must have added significantly to the victims' dread and terror in those last few moments. Noteworthy is the "quiescence" (as noted in the prior section) of most of the passengers in the initial moments of the hijacking, followed by confusion and inability to focus and develop a plan of action, despite awareness that destruction was imminently at hand. The trained cabin crew did a commendable job under unbelievably stressful conditions and was able to suppress some of the signals from the amydala and the "fear network," but as their training did not involve action, they remained essentially passive reporters of their own demise. Mr. Hanson provides the most harrowing description of the conditions undoubtedly aboard both aircraft. *"Getting very bad passengers are getting sick and throwing up I think we are going down....My God my God!!"* Although the aircraft jerky movements may have contributed to airsickness in a few isolated cases, we know from experience that the bad weather conditions will not produce the kind of mass "sickness" described by Mr. Hanson. He is describing the physiological end result of absolute and abject terror, the kind that makes up our very worst nightmares. Of note is both Ms Ong's and Mr. Hanson's call to God as their final words. They knew with absolute certainty that this would be the end of their existence; their hopes and dreams, everything they were and had been, and even at the absolute end, fear of the "great unknown." All of those aboard were certainly exquisitely aware that there would be no deliverance and of the fear that there would only be, for however brief a moment, only unimaginable pain and torment. A moment prolonged by the subjective slowing of time common in these situations.

ECF No. 2554-3 (Exhibit B) at 4-5.

As established by Dr. Diaz's testimony, Michael Theodoridis and Rahma Salie suffered severe emotional distress from knowing they themselves would die. And just as Dr. Diaz testified that the 9/11 victims on the passenger planes knew they themselves would be killed, it follows that these same plaintiffs would also have been aware that a spouse, sitting right next to

5

them, was also experiencing severe emotional distress and would also be killed, in addition to knowing their unborn child would also die. The 9/11 Memorial lists Rahma's name as "Rahma Salie and her unborn child." *See* ECF No. 10328-2 (photograph). It is impossible to put into words the emotional trauma both Michael Theodoridis and Rahma Salie suffered knowing they themselves would die, their spouse (each other) would die, their unborn child would die, and all they had built and hoped for in the future would come to an end.

This Court accepted Dr. Diaz's testimony on the pain and suffering experienced by 9/11 victims and awarded damages judgments based on his testimony. *See* ECF No. 2618 at 8 (Judge Maas' Report and Recommendation) ("Although the specifics of each decedent's demise remain largely unknown, the Plaintiffs have submitted the expert report of Dr. Alberto Diaz, Jr., M.D., a retired Navy Rear Admiral, which provides a chilling account of the horrific conditions that each of the Estate Plaintiffs' decedents likely encountered immediately before his or her death. (See Pls.' Mem. Exs. D, E). As Dr. Diaz's report confirms, there is little doubt that many, if not all, of the decedents in this case experienced unimaginable pain and suffering on September 11, 2001."); ECF No. 2623 at 4 (adopting Report and Recommendation) ("there is little doubt that many, if not all, of the decedents in this case experienced unimaginable pain and suffering on September 11, 2001."). It follows that the Court should also find Iran liable for IIED here where a husband and pregnant wife were sitting next to each other on American Airlines Flight 11, would have seen their loved one suffering, would have known that they, too, would die, would have known their unborn child would die, and their future would never come true.

As established by Dr. Diaz's testimony, and as acknowledged by Magistrate Judge Netburn (Report at 13), both Mr. Theodoridis and Ms. Salie suffered severe emotional distress

from witnessing each other's immense pain and suffering, and having the knowledge that their unborn child would die, in the final moments leading up to each other's death.

## II.     PROCEDURAL HISTORY

Beginning in 2012, U.S. national plaintiffs who are immediate relatives of 9/11 victims have obtained judgments against Iran in the amounts of $12.5 million per spouse, $8.5 million per child, $8.5 million per parent, and $4.25 million per sibling. ECF No. 2623. Since 2012, these amounts have been adopted by the Court in various orders awarding damages judgments to the immediate family members of 9/11 victims. *E.g.*, ECF No. 10997.

On September 5, 2024, undersigned counsel filed a motion for liability and damages judgments for certain non-U.S. national 9/11 victim estate and immediate family member plaintiffs, in an attempt for them to obtain parity with their U.S. national plaintiff counterparts and be awarded judgments against Iran. ECF No. 9320. Since non-U.S. national plaintiffs cannot move for a judgment based on 28 U.S.C. § 1605A, those plaintiffs relied on 28 U.S.C. § 1605(B) to assert state law causes of action against Iran.

On June 17, 2024, this Court awarded most of those non-U.S. national plaintiffs liability and damages judgments based on New York law in the identical amounts awarded to U.S.-national plaintiffs who previously moved under 28 U.S.C. § 1605A. ECF No. 9931. The Court denied without prejudice the motion brought on behalf of the Estates of Michael Theodoridis and Rahma Salie because they died simultaneously and the motion did not address the impact of this fact on their IIED claims. *Id.* at 6 n.5.

On August 29, 2024, the Estates of Michael Theodoridis and Rahma Salie filed a renewed motion for liability and damages against Iran. ECF No. 10267. On September 6, 2024, the Court denied that motion without prejudice because the motion did not list a personal

7

representative for either estate plaintiff, and granted the plaintiffs leave to refile once a personal representative is provided for each plaintiff. ECF No. 10319. On September 9, 2024, undersigned counsel filed a renewed motion for liability and damages against Iran for the Estates of Michael Theodoridis and Rahma Salie. ECF No. 10326.

On May 23, 2025, Magistrate Judge Netburn recommended that this Court deny the motion for IIED damages brought on behalf of the Estates of Michael Theodoridis and Rahma Salie. ECF No. 10965. The Report based its recommendation to deny the motion solely on the fact that *solatium damages* are improper here since Michael Theodoridis and Rahma Salie did not survive one another, but did not consider that compensable severe emotional distress damages under New York law need not be solatium damages.

### III. LEGAL STANDARD

When a party files objections to a report and recommendation, a district court must make a *de novo* determination as to those portions of the report to which objections are made. *See* 28 U.S.C. § 636(b)(l)(C); *Rivera v. Barnhart*, 423 F. Supp. 2d 271, 273 (S.D.N.Y. 2006). The district court judge may also receive further evidence or recommit the matter to the magistrate judge with instructions. *See* Fed. R. Civ. P. 72(b); 28 U.S.C. § 636(b)(1)(C). The court must "arrive at its own, independent conclusion" regarding those portions of the report to which objections were made. *Nelson v. Smith*, 618 F. Supp. 1186, 1189-90 (S.D.N.Y. 2005) (quoting *Hernandez v. Estelle*, 711 F.2d 619, 620 (5th Cir. 1983)).

IV.     **ARGUMENT**

    A.     **The Report Improperly Narrows What Constitutes "Severe Emotional Distress" to Establish an IIED Claim Under New York Law**

A New York[2] IIED claim "has four elements: (i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress." *Howell v. N.Y. Post Co., Inc.*, 81 N.Y.2d 115, 121 (1993); *accord Rich v. Fox News Network, LLC*, 939 F.3d 112, 122 (2d Cir. 2019). Magistrate Judge Netburn correctly found that the first three elements of Plaintiffs' IIED claims are "plainly establish[ed]." Report at 12. The Report's only flaw is its incorrect assumption that the fourth element—"severe emotional distress"— is only compensable if it is analogous to solatium damages under Federal law. Report at 14. Specifically, the Report notes that "in Foreign Sovereign Immunities Act ("FSIA") cases, 'courts have recognized that a solatium claim is 'indistinguishable from the claim of intentional infliction of emotional distress.'"" Report at 4 (quoting *Surette v. Islamic Republic of Iran*, 231 F. Supp. 2d 260, 267 n.5 (D.D.C. 2002)). But this analysis is misleading. Courts have analogized IIED claims and solatium claims for the purpose of *quantifying damages*, but these cases were not intended to limit what types of severe emotional distress are compensable under New York law. Rather, New York law has found "severe emotional distress" not just based on solatium, but also from witnessing an injury. *See Bovsun v. Sanperi*, 61 N.Y.2d 219, 221 (1984) (severe emotional distress suffered as a direct result of a defendant's conduct is compensable); *Delosovic v. City of New York*, 143 Misc. 2d 801, 810 (N.Y. Cnty. Sup. Ct., 1989), *aff'd sub nom.*

---

[2] Magistrate Judge Netburn correctly found that New York law applies. Report at 9.

*Delosevic v. City of New York*, 174 A.D.2d 407, 572 N.Y.S.2d 857 (1991) (finding severe emotional distress resulting from witnessing an accident to be compensable); *Shipley ex rel. Shipley v. Williams*, 14 Misc. 3d 682, 683 (Richmond Cnty. Sup. Ct. 2006) (sister could bring claim for severe emotional distress for observing her brother sustain serious physical injury and death); *Greene v. Esplanade Venture P'ship*, 36 N.Y.3d 513, 525 (2021) (grandparent could amend pleadings to bring a claim for severe emotional distress for observing the death of their grandchild); *Collesides v. Westinghouse Elec. Corp*, 125 Misc.2d 413, 413-15 (Albany Cnty. Sup. Ct. 1984) (holding that a mother who "helplessly observed [her] daughter have her finger ripped from her hand while waiting for help" could bring a claim for emotional distress); Restatement (Third) of Torts: Phys. & Emot. Harm § 46 (2012) ("An actor who by extreme and outrageous conduct intentionally or recklessly causes severe emotional harm to another is subject to liability for that emotional harm and, if the emotional harm causes bodily harm, also for the bodily harm."); *see also* Comment M ("When an actor's extreme and outrageous conduct causes harm to a third person, as, for example, when a murderer kills a husband in the presence of his wife," the murderer is liable to the wife, and "[i]f an actor harms someone for the purpose of inflicting mental distress on another person," presence is not required); Restatement (Second) of Torts § 436 (1965)[3] ("If the actor's conduct is negligent as creating an unreasonable risk of causing bodily harm to another otherwise than by subjecting him to fright, shock, or other similar and immediate emotional disturbance, the fact that such harm results solely from the internal operation of fright or other emotional disturbance does not protect the actor from liability. . . .

---

[3] While this Restatement section deals with *negligent* infliction of emotional distress and not *intentional* infliction of emotional distress, and more specifically has to do with physical harm resulting from emotional disturbance, both types of emotional distress causes of action require emotional distress.

Th[is] rule [ ] applies where the bodily harm to the other results from his shock or fright *at harm or peril* to a member of his immediate family occurring in his presence.") (emphasis added). New York case law is also clear that parents can recover for emotional distress based on the death of their unborn child. *See Broadnax v. Gonzalez*, 2 N.Y.3d 148, 155 & n.4 (2004) ("even in the absence of an independent injury, medical malpractice resulting in miscarriage or stillbirth should be construed as a violation of a duty of care to the expectant mother, entitling her to damages for emotional distress").

Nevertheless, the Report limits its analysis to solatium claims and states they require an immediate family member's survival of a loved one. Report at 14 ("To recover additional solatium damages, then, the Plaintiffs must show that Ms. Salie and Mr. Theodoridis suffered "mental anguish, bereavement, and grief . . . as a result of [another] decedent's death," or as compensation for "the harm caused by the loss of [a] decedent's society and comfort." Damages R&R [ECF No. 2618] at 10 (quoting *Dammarell v. Islamic Republic of Iran*, 281 F. Supp. 2d 105, 196 (D.D.C. 2003), *vacated on other grounds*, 404 F. Supp. 2d 261 (D.D.C. 2005)); *see also Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 29 (D.D.C. 1998) ("Solatium is traditionally a compensatory damage which belongs to the individual heir personally for injury to the feelings and loss of decedent's comfort and society . . . .").) While the Report's analysis may be true for purposes of awarding solatium damages, it is not the only basis for awarding IIED damages or finding severe emotional distress.

Since the Plaintiffs moved for judgments based on IIED, the relevant inquiry is not whether the Plaintiffs survived each other, and therefore missed each other's company, but rather whether the Plaintiffs suffered severe emotional distress due to (1) witnessing the other's death,

(2) witnessing the other's impending death (3) witness their unborn child's impending death, *or* (4) witnessing the other's severe emotional distress. Under New York case law, these types of emotional distress are clearly compensable. *Supra* 9-10.  The analysis in those cases does not reach granular level of whether emotional distress was caused by witnessing death or by witnessing someone about to die, but those cases are sufficiently analogous to inform this Court's decision and the Restatement specifically notes that damages are appropriate from "shock or fright at harm *or peril*," confirming that emotional distress from witnessing either is compensable.  And the record, which the Report fully credits, establishes that the Plaintiffs suffered unimaginable emotional distress through watching each other suffer up to the moment they died.

### 1.    Intentional Infliction of Emotional Distress

The well-supported evidence that has been accepted by this Court readily establishes that Michael Theodoridis and Rahma Salie, a married couple who were passengers on American Airlines Flight 11, suffered severe emotional distress from witnessing each other's immense pain and suffering, and from knowing their unborn child would die, leading up to each other's death. And as previously stated, the Report acknowledges that "Ms. Salie and Mr. Theodoridis suffered severe emotional distress during the 9/11 Attacks." Report at 13.

The Report credited the expert report of Dr. Alberto Diaz, Jr., M.D., a retired Navy Rear Admiral, which highlights "the pain and suffering that 9/11 victims experienced." *See* Report at 13 ("Dr. Diaz's report 'provides a chilling account of the horrific conditions that each of the [9/11] decedents likely encountered immediately before his or her death,' [ ]—"fear, pain, and physical and psychological anguish that was almost unfathomable'").

Notwithstanding Dr. Diaz's chilling testimony, the Report describes Dr. Diaz's report as opining on "the 9/11 decedents' *own* distress," for which the Report stated the Plaintiffs already recovered. Report at 14. But it follows that if Michael and Rahma experienced extreme fear and anguish from their own pain and suffering, that they would have experienced severe emotional distress from witnessing each other's pain and suffering leading up to death and from knowing their unborn child would die. Michael and Rahma were seated next to each other and Rahma was pregnant. The severe emotional trauma suffered by both Michael and Rahma is unthinkable and the exact type of harm IIED should remedy. *Supra* 4-5.

For these reasons, this Court should find Iran liable to the Estates of Michael Theodoridis and Rahma Salie for IIED.

### B.    The Estates of Michael Theodoridis and Rahma Salie Should Be Awarded Damages

#### 1.    Solatium Damages

If the Court overrules the Report and finds Iran liable to the Estates of Michael Theodoridis and Rahma Salie for IIED, this Court should grant each estate a $12,500,000 compensatory damages judgment, which is consistent with what other spouses of non-U.S. national 9/11 victims have been awarded by this Court. ECF No. 9931.[4]

---

[4] In egregious emotional distress cases before the Second Circuit, damage awards in excess of $500,000 have been upheld. *See Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 146, 151-52, 163 (2d Cir. 2014) (upholding award of $1.32 million for emotional distress where plaintiff had been subject to "an extraordinary and steadily intensifying drumbeat of racial insults, intimidation, and degradation over a period of more than three years," which caused post-traumatic stress disorder, short-term adjustment disorder, depression, a panic disorder, and multiple hospitalizations).

## CONCLUSION

The Estates of Rahma Salie and Michael Theodoridis respectfully object to Magistrate Judge Netburn's Report & Recommendation at ECF No. 10965, only insofar as it recommended that this Court deny their motion for IIED damages judgments based solely on the finding that these plaintiffs did not suffer compensable "severe emotional distress" under New York law for the death of their loved one on September 11, 2001, and their unborn child.

The plaintiffs request (1) that the Estates of Michael Theodoridis and Rahma Salie each be awarded compensatory damages in the amount of $12,500,000; (2) prejudgment interest of 4.96% on the intentional infliction of emotional distress award running from September 11, 2001 until the date of judgment be assessed; and (3) permission for such plaintiff to seek punitive damages and other appropriate damages at a later date.

| | | |
|---|---|---|
| Dated: | New York, New York<br>June 27, 2025 | Respectfully submitted,<br><br>*/s/ Jerry S. Goldman*<br>ANDERSON KILL P.C.<br>Jerry S. Goldman, Esq.<br>Bruce E. Strong, Esq.<br>Alexander Greene, Esq.<br>7 Times Square, 15th Floor<br>New York, NY 10036<br>Tel: (212) 279-1000<br>Fax: (212) 278-1733<br>Email:  jgoldman@andersonkill.com<br>          bstrong@andersonkill.com<br>          agreene@andersonkill.com<br>*Attorneys for Plaintiffs* |